# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MASON CAPITAL, LTD.,          :
                                        :

                 Plaintiff,     :

                                          :          NO. 3:05CV1470 (MRK)

v.                                 :

                                          :

KAMAN CORPORATION, ET AL.,  :

                                         :

            Defendants.    :

## MEMORANDUM OF DECISION

In this diversity action, Plaintiff Mason Capital ("Mason") seeks declaratory and injunctive relief to prevent Defendants Kaman Corporation ("Kaman") and members of the Kaman family and affiliated entities (collectively, "Kaman family"),[1] from implementing a recapitalization proposal that Mason asserts violates the voting requirements for business combinations under Chapter 601, Part XII of Connecticut's Business Corporation Act, Conn. Gen. Stat. §§ 33-840, *et seq.* (the "Business Combination Act" or "Act"). In brief, Mason claims that the transaction at issue is a "business combination" within the meaning of Conn. Gen. Stat. § 33-840(4) and that Kaman and the Kaman family should be permanently enjoined from completing the transaction until it is approved by a vote of two-thirds of Kaman's disinterested shareholders as required for business combinations under Conn. Gen. Stat. § 33-841. Kaman and the Kaman family deny that Connecticut law requires such a supermajority vote to approve the recapitalization. Whether the Business Combination Act requires approval by a two-thirds vote will determine who controls Kaman in the future.

---

[1] The Kaman family defendants are Charles H. Kaman, C. William Kaman, Steven W. Kaman, Cathleen H. Kaman, Roberta L. Kaman, Newgate Associates Ltd. Partnership, and Oldgate Ltd. Partnership.

At the outset, the Court emphasizes two notable aspects of this case. First, while this Court does not pretend to be a "rocket docket," this case has nonetheless proceeded extraordinarily quickly from filing to trial. Mason filed its complaint on September 19, 2005, and the Court held a bench trial on the merits of Mason's claims just three weeks later, on October 7. In the brief interim between filing and trial, the parties conducted expedited discovery and filed joint stipulations of fact [docs. ##27, 79], joint stipulated questions of law [docs. ##68, 69], proposed findings of fact and conclusions of law [docs.## 9, 23, 26, 44], and several briefs, *see* Defendant Kaman Corporation's Pretrial Memorandum [doc. #24]; Plaintiff Mason's Trial Brief [doc. #25]; Defendant Charles H. Kaman's Pretrial Memorandum [doc. #39]; Plaintiff Mason's Opposition to Defendants' Pre-Trial Memoranda [doc. #47]; Defendant Kaman Corporation's Opposition to Mason's Trial Brief [doc. #48]. The Court commends the superior legal work of the attorneys for the various parties. These attorneys have demonstrated the very highest standards of skill, hard work, cooperation and professionalism under extreme time pressure. They have shown that with cooperation and professionalism, civil proceedings in the federal courts need not be bogged down with endless motion practice and discovery.

Second, this case calls on a federal court to interpret a previously unconstrued section of a Connecticut statute. In view of the importance of the issues presented and the lack of any guidance on this issue from Connecticut courts, the Court recommended strongly that the parties agree upon direct certification to the Connecticut Supreme Court. However, Defendants declined the Court's entreaties in order to minimize delay to the transaction that lies at the heart of the case – the same consideration that caused the parties to agree to an expedited trial in the first place. Regrettably, therefore, this Court must make an *Erie* guess as to how the Connecticut Supreme Court would

construe an important state statute, a guess that will be binding only upon the parties to this case and that any Connecticut court will be free to ignore.  *See*, *In re Vebeliunas*, 332 F.3d 85, 90-91 (2d Cir. 2003) ("In the absence of controlling authority, this Court must attempt to determine how the [state supreme court] would resolve this issue.").

For several reasons, the Court approaches its task with considerable caution.  First, the Business Combination Act is a state statute that has not yet been construed by any Connecticut court and that is not a part of any model act.  Even on the broader issue of statutory construction there is a startling lack of relevant state authority to guide the Court's deliberation.  Second, the statute in question deals with a complex area of corporate law in which the Court has no particular expertise. Furthermore,  the statute sweeps broadly, so the Court's interpretation may well affect a great deal of business activity.  Third, with all due respect to the Connecticut General Assembly, the statute is not a model of clarity, and, in truth, its words are susceptible to more than one plausible interpretation.  Nonetheless, the parties have relied on the Court to provide an interpretation, and the "silence of Connecticut's courts . . . neither releases us from our responsibility nor lightens our burden," to estimate the position of the Connecticut Supreme Court. *Marina Management Corp. v. Brewer*, 572 F.2d 43 (2d Cir. 1978).

## I.

The following facts are drawn from the parties' Joint Stipulation of Facts [doc. #27] and Joint Stipulation of Additional Facts [doc. #79], as well as the Recapitalization Proposal (Plaintiff's Exhibit 1),  the Proxy Statement (Plaintiff's Exhibit 2), and the testimony of the parties' fact witnesses at the bench trial that the Court conducted.

Kaman is a Connecticut corporation with its principal place of business in Bloomfield,

Connecticut. Kaman provides high technology products and services to commercial and government markets in the fields of aerospace, industrial distribution, and music distribution. For over fifty years, voting control of Kaman has resided in the hands of its founder, former CEO, and director, Charles Kaman, and various of his family members. As structured prior to the transaction that is the focus of this case, Kaman stock was divided into a large pool (22,383,368 shares outstanding) of Class A Nonvoting Common Stock ("Class A stock"), and a small pool (667,814 shares outstanding) of Class B Voting Common Stock ("Class B stock"). Class A stock is traded on the NASDAQ; Class B stock is not traded on any stock exchange. As the names of the two classes of stock suggest, Class B stock is the only class of Kaman capital stock that carries voting rights. Charles Kaman is the beneficial owner of 53.15% of Class B shares, and his family members personally and through a limited partnership together hold another 29.45% of the voting control of the company. Thus, the Kaman family controls over 82% of the Class B shares, and through that ownership, the family has voting control over the corporation. With respect to Class A shares, the Kaman family and affiliated parties own only approximately 5% of the issued and outstanding shares.

Mason is an investment fund incorporated in the Cayman Islands with its principal place of business in New York. Mason invests in companies whose asset value or operational potential is undervalued by the public market. Along with its affiliates, Mason owns 55,642 shares, or 8.33%, of Kaman's Class B stock, more than half of which Mason has acquired since May 2005. Mason and its affiliates also hold approximately 3000 of the more than 22 million Class A shares.

According to Kaman's President, CEO, and Chairman, Paul Kuhn, in or about 1999-2000, he and the Kaman family began to discuss the desirability of altering the capital structure of the company. They did so for two principal reasons. First, the Kaman family wished to increase its

liquidity by freeing the large quantity of Charles Kaman's assets that were tied up in the company. Second, Kaman management wanted to enhance the Class A stock with voting rights so that the company could more readily use Class A stock as currency in acquisitions.

To that end, in April 2003, Kaman's Board of Directors appointed a special committee to consider alternatives to the current capital structure of the company ("Special Committee"). The Special Committee hired two independent financial advisors, one to represent the interests of Class A shareholders and one to represent the interests of Class B shareholders. On June 7, 2005, the Special Committee and the Board of Directors approved a transaction (the "Recapitalization Proposal") with the Kaman family and related entities (the "Signatory Shareholders") under which Kaman's two-tiered stock structure would be replaced by a single class of voting Common Stock. Under the Recapitalization Proposal, Kaman's certificate of incorporation would be amended to endow the existing Class A non-voting stock with voting rights. The Class A stock would also be re-designated in the company's certificate of incorporation as voting Common Stock. Holders of the existing Class B voting stock would be entitled to convert each share of Class B stock into 1.95 shares of the newly reclassified voting Common Stock, or, alternatively, into one share of voting Common Stock plus cash in the amount of $14.76. The Recapitalization Proposal obliged the Kaman family to elect the mixed-stock-and-cash alternative for as many of their Class B shares as would be required to prevent their proportionate holdings of any class of Kaman stock from increasing by more than five percent of the total outstanding shares. As will be explained below, Kaman management hoped in this manner to ensure that the recapitalization would not qualify as a "business combination" and would therefore require approval by a simple majority vote rather than the two-thirds vote of disinterested shareholders that the Business Combination Act dictates for

business combinations with interested shareholders such as the Kaman family.

While developing the Recapitalization Proposal, the Special Committee also recommended, and the Board approved, a variety of amendments to Kaman's certificate of incorporation affecting the governance of the company ("Governance Amendments").  The Governance Amendments will become effective upon completion of the Recapitalization Proposal. Among other things, the Governance Amendments: divide the company's Board of Directors into three classes serving staggered terms; state that shareholders are able to remove directors only for cause and by a majority vote; and require a supermajority vote to amend, repeal, or modify certain provisions of the certificate of incorporation and bylaws. As the Proxy Statement describing the Recapitalization Proposal recognizes, the Governance Amendments are significant because they "may prevent a change in control of the company that a majority of the shareholders may consider favorable." Proxy Statement Section on Risk Factors, Pls.' Ex. 2, at 2.  Mason argues, and not without basis, that the combination of the Recapitalization Proposal and the Governance Amendments will transfer effective control of Kaman from the Kaman family to the company's management.

Although Kaman's Class A stock is non-voting, the Recapitalization Proposal required approval by both Class A and Class B shareholders because Connecticut's Business Corporation Act provides that even holders of non-voting stock have the right to vote on any amendment to the certificate of incorporation that will "[c]hange the rights, preferences or limitations of all or part of the shares of the class." *See* Conn. Gen. Stat. §§ 33-798(a)(3) & (d).  However, neither Connecticut law nor Kaman's certificate of incorporation permitted the Class A shareholders to vote directly on the Governance Amendments.  Only Class B shareholders could vote directly on the Governance Amendments.  Class A shareholders could express their views on the Governance Amendments only

by voting "no" on the Recapitalization Proposal to which the governance changes were linked

Included in the Recapitalization Proposal was a provision allowing the Signatory Shareholders to terminate the transaction within a specified period of time if a third party proposed a transaction that, among other things, offered all Class B stockholders a minimum of $46.62 in cash or publicly traded securities per Class B share. On June 28, 2005, three weeks after Kaman's Board and Special Committee approved the Recapitalization Proposal, Mason and another limited liability company called MK Investments entered into an agreement with the Signatory Shareholders to purchase all their Class B shares for $55 per share (the "Mason Purchase Agreement").   In accordance with the Recapitalization Proposal, the Mason Purchase Agreement was reviewed by an arbitrator, who determined that it satisfied all of the requirements imposed by the Recapitalization Proposal on third-party offers and their acceptance.  As one of the Mason partner's testified at oral argument, the purpose of the Mason Purchase Agreement was to put control of Kaman into Mason's hands.

However, the Recapitalization Proposal also provided a short period for Kaman to outbid a qualifying third-party offer. On July 28, one month after the Mason Purchase Agreement was signed by Mason and the Kaman family, Kaman's Board and Special Committee approved a Substitute Recapitalization Proposal, topping Mason's $55 per share offer by $0.65 per share. Under the Substitute Recapitalization Proposal, each share of Class A non-voting stock would continue to be re-designated as a single share of voting Common Stock, but the ratio for converting Class B voting stock to voting Common Stock and/or cash increased substantially. The Substitute Recapitalization Proposal provides for conversion of each share of Class B voting stock into either 3.58 shares of voting Common Stock, or, alternatively, 1.84 shares of voting Common Stock plus a cash payment

of $27.10 per share.

According to the testimony at trial, for holders of Class B shares, the Substitute Recapitalization Proposal has a value of $55.65 per share of Class B stock. Thus, Mason's attempt to acquire control of the company has resulted in what witnesses at trial called a "sweetened" offer to the Kaman family.  Due to the large increase in the value of the Class B portion of the Substitute Recapitalization Proposal,  Kaman will now need to take on debt to finance the cash purchase of a sufficient number of Class B shares from Kaman family stockholders to prevent the family's holdings from increasing by more than five percent. Under the lower conversion ratio provided in the original Recapitalization Proposal, Kaman would not have needed to take on debt to finance the transaction.

Under the Substitute Recapitalization Proposal, implementation required each class of shareholders independently to approve the recapitalization by  a simple majority, with a majority of the votes entitled to be cast in each class constituting a quorum. If a simple majority vote is all that is required to approve the Substitute Recapitalization Proposal, Kaman management would be assured of a favorable vote from the Class B shareholders, because the Kaman family and related entities – who collectively control more than 80% of the Class B stock –  are bound by the terms of the Substitute Recapitalization Proposal to vote all of their shares in favor of both the recapitalization and the Governance Amendments.  Approval of the transaction by the Class A shareholders is not similarly guaranteed, because the Kaman family and its affiliates own only 5% of those shares.

However, if Connecticut law requires the recapitalization to be approved by two-thirds of the disinterested Class B shareholders, then the Kaman family votes would be excluded because they are considered "interested" shareholders. *See* Conn. Gen. Stat. § 33-840(9). And in that event, Mason could effectively block the recapitalization with its 8.33% of the Class B shares, which constitute

almost half of the approximately 18% of Class B shares not owned by the Kaman family and its affiliates. In short, if the supermajority vote requirements of Connecticut's Business Combination Act apply to the recapitalization, Mason can veto the transaction, and since the Kaman family has not yet terminated the Mason Purchase Agreement, Mason might then acquire their holdings of Class B shares (the only shares that currently carry voting rights), and thereby acquire control of the company.

In mid-August, Kaman filed with the SEC a Registration Statement containing the form of the Proxy Statement for the Substitute Recapitalization Proposal, and two amendments to the Registration Statement. The Registration Statement was declared effective on September 1, and Kaman then began mailing the Proxy Statement to its Class A and Class B shareholders. Asserting that the recapitalization is a business combination requiring approval by a two-thirds vote of disinterested shareholders, rather than by a simple majority vote of each class of shareholders, Mason filed this action for declaratory and injunctive relief against Kaman Corporation and the Kaman family shareholders and affiliated entities on September 19, 2005.

Three days later, on September 22, the Court held a telephonic status conference with the parties [doc. #35], and on September 26, the Court granted the parties' joint oral motion to expedite the proceedings in the case [doc. #17].  Rather than waste time and energy on preliminary injunction proceedings, the parties sensibly agreed to an expedited bench trial at which the Court would rule on the merits of Mason's claims and its request for permanent injunctive relief. [doc. #17]. The parties further agreed that Kaman would proceed with the vote on the Substitute Recapitalization Proposal and would count the votes, but that the company would not consummate the transaction until this Court ruled on Mason's claims, a ruling that the Court promised to provide expeditiously.

During the next two weeks, Kaman and the defendant family members filed answers and Kaman filed a counterclaim [docs. ##18, 54], and the parties engaged in expedited discovery. At the Court's request, the parties also filed joint stipulations of fact [docs. ##27, 79], joint stipulated questions of law [docs. ##68, 69], proposed findings of fact and conclusions of law [docs.## 9, 23, 26, 44] and several pre-trial briefs, *see* Defendant Kaman Corporation's Pretrial Memorandum [doc. #24]; Plaintiff Mason's Trial brief [doc. #25]; Defendant Charles H. Kaman's Pretrial Memorandum [doc. #39]; Plaintiff Mason's Opposition to Defendants' Pre-Trial Memoranda [doc. #47]; Defendant Kaman Corporation's Opposition to Mason's Trial Brief [doc. #48].

On October 7, 2005, three weeks after the filing of the Complaint, the Court held a bench trial and heard argument on Mason's claims. In the interests of resolving quickly the issues bearing directly on implementation of the Substitute Recapitalization Proposal, the parties agreed that the Court should defer consideration of Kaman's substantively distinct counterclaim of abuse of process. At trial, each side presented one fact witness and one expert witness.  During trial, the Court took under advisement Kaman's oral Motion to Dismiss [doc. #71] and Mason's Motion in Limine to Preclude Expert Testimony [doc. #43].[2] In the two weeks following trial and argument, the parties

---

[2] Mason's Motion in Limine to Preclude Expert Testimony [doc. #43] is GRANTED IN PART and DENIED IN PART. Each side presented testimony of experts on corporate finance and securities transactions.  Kaman's expert was Professor John C. Coates of Harvard Law School.  Not to be outdone, Kaman proffered the testimony of Sterling Professor of Law Alan Schwartz of the Yale Law School. The Court grants Mason's motion in limine to the extent that the experts provided testimony on what they believed is the meaning of the Connecticut's Business Combination Act. The construction of statutes is a judicial task and not a proper subject of expert testimony. *See, e.g.*, *United States. v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions."); *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 381 (S.D.N.Y. 1999) ("[T]his Court has repeatedly held that the testimony of an expert on matters of domestic law is inadmissible for any purpose."). Accordingly, the Court has disregarded all such testimony from each side's experts. However, the

submitted post-trial briefs on a variety of subjects including the appropriate calculation of what is referred to below as the 5% Rule.   *See* Kaman Corporation's Report as to Calculations [doc. #72], Mason's Post-Trial Memorandum Regarding the Proper Application of the 5% Test [doc. #78]; Kaman Corporation's Post-Trial Memorandum [doc. #81].

A vote of the shareholders on the Substitute Recapitalization Proposal was held on October 11, 2005.  At the October 11 shareholder meeting, 82.4% of the holders of Class A stock and 90.7% of the holders of Class B stock voted for the recapitalization. The Governance Amendments were also approved by 90.5% of the Class B shareholders. Based on the number of shares outstanding on October 11, the Kaman family and affiliated parties were required to make the part stock/part cash election with respect to 505,851 shares of Class B stock.  As a consequence, if the recapitalization is consummated, Kaman will have to pay the Kaman family and its affiliates more than $13 million for its Class B stock, and as a result, the Kaman family – who will then hold only 9.7% of the company's Common Stock – will no longer control the company.

In addition to deciding Mason's request for declaratory and injunctive relief, this opinion also addresses the following pending motions: Defendant Kaman's Motion to Dismiss [doc. #71]; Plaintiff Mason's Motion in Limine to Preclude Expert Testimony [doc. #43]; Plaintiff Mason's Motion for Entry of Judgment under Rule 54(b) [doc. #80]; Plaintiff Mason's Motion for Injunction Pending Appeal [doc. #82]; and Plaintiff Mason's Motion to Strike Portions of the Affidavit of

---

Court denies Mason's motion with respect to the valuable testimony provided by both experts on the way in which those in the merger and finance industry construe various forms of business combinations and the manner and form in which such transactions take place.  That testimony is clearly relevant to the proper interpretation of a statute regulating a specialized area of law, and the Court has therefore considered the testimony of each party's expert regarding industry nomenclature and practices.

Candace A. Clark [doc. #84]. The Court has not heard evidence or argument regarding, and therefore does rule at this time on, Kaman's counterclaim [doc.# 18].

## II.

In their Joint Stipulation of Questions of Law [doc. #69], the parties agreed that the Court should address the following questions:

1.   Has Mason met its burden of proof that the Recapitalization Proposal[3] is a business combination involving a merger, consolidation or share exchange with an interested shareholder within the meaning of the Business Combination Act, Conn. Gen. Stat. § 33-840(4)(A)?

2.   Has Mason met its burden of proof that the Recapitalization Proposal is a business combination involving a reclassification of securities, including any reverse stock split, or recapitalization of the corporation, within the meaning of the Business Combination Act, Conn. Gen. Stat. § 33-840(4)(E)?

3.   Even if Mason has met its burden of proof with respect to Questions 1 or 2 above, has Mason also met its burden of proof that it is entitled to permanent injunctive relief?

4.   Has Kaman met its burden of proof under one or more of its Special Defenses such that Mason's claims are barred?

The first two questions require the Court to construe and apply the Connecticut Business Combination Act, Conn. Gen. Stat. §§ 33-840 to 845.  That Act was  enacted in 1984 in the midst

---

[3] Strictly speaking, the transaction at issue is the Substitute Recapitalization Proposal. However, since the parties refer to it as the Recapitalization Proposal in their stipulation as to questions of law, the Court will adhere to their terminology in the balance of this opinion.

of what commentators have described as a movement in states to pass so-called "fair price" statutes, provisions designed to mitigate the coercive effects of front-loaded or two-tier tender offers. *See, e.g.*, James J. Hanks Jr., *Maryland Corporation Law*, 47 Bus. Law. 1355, 1358 n.17 (1992) (characterizing Maryland's fair price statute as part of the "proliferation of this statutory bulwark against the once-dreaded front end-loaded, two tier tender offer") (citing James J. Hanks, Jr. & Stephen Stec, *Charting the Rising Tide of State Takeover Legislation*, Insights, Sept. 1988, at 22); Evelyn Sroufe & Catherine Gelband, *Business Combinations Statutes: A "Meaningful Opportunity" for Success*?, 45  Bus. Law. 891 n.3 (1990) ("A number of states have adopted 'fair price' statutes designed to protect shareholders from the coercive effects of two-tier tender offers."); Roberta Romano, *The Political Economy of Takeover Statutes*, 73 Va. L. Rev. 111, 117-18 & n.17 (1987) (citing fair price statutes passed in fourteen states).

Section 33-841 requires that "business combinations" be approved by a supermajority of two-thirds of the disinterested shareholders of the voting stock of the corporation. In this way, the Act protects minority holders of voting stock from abusive transactions favoring interested shareholders – that is, shareholders holding more than 10% of any class of a corporation's equity securities.  The previous section of the Act, Section 33-840(4), defines as "business combinations" five categories (in subsections A through E) of transactions involving interested shareholders. A later provision of the Act, Section 33-842, provides a variety of exceptions to the supermajority requirement for those transactions defined as business combinations in Section 33-840(4)(A), and a couple of exceptions for all categories of business combinations, including a provision that allows a corporation to override the supermajority requirement by including language to that effect in its certificate of incorporation. The parties have stipulated that the exceptions set forth in Section 33-842 do not apply

to the Recapitalization Proposal at issue in this case.

Section 33-840 defines the transactions that are subject to the supermajority vote requirement of the Act and it is the focus of this litigation.  In construing that section, the Court relies on the text of the statute, its structure, whatever purpose may be gleaned from its words and structure, and the usual cannons of construction. This approach is consistent with the mandate of the Connecticut Plain Meaning Statute, Conn. Gen. Stat. § 1-2z, which states as follows:

> The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.

Connecticut's Plain Meaning Statute controls in this case because this is a diversity action and the Court is "bound to interpret Connecticut law according to Connecticut's own interpretative rules." *Morenz v. Wilson-Coker*, 415 F.3d 230, 236-37 (2d Cir. 2005); *see Allstate Insurance Co. v. Serio*, 261 F.3d 143, 152 (2d Cir. 2001) ("[F]ederal courts ought not to deprive the state courts of the opportunity to construe their own statutes, using the interpretive tools, presumptions, and standards they deem proper.").

Although the constitutionality of Connecticut's Plain Meaning Act has been questioned by at least one Justice of the Connecticut Supreme Court,[4] this Court has neither the authority nor the inclination to deviate from it. *See Murphy ex rel. Estate of Payne v. U.S.*, 340 F. Supp. 2d 160, 171 (D. Conn. 2004) ("The Court understands all too well that using legislative history to construe a

---

[4] *See Genesky v. East Lyme*, 275 Conn. 246, 279 n.5 (2005) (Borden, J. concurring) (suggesting that Section 1-2z "might well be unconstitutional under the doctrine of the separation of powers . . . as a statute that significantly interferes with the core judicial task of statutory interpretation" if it is interpreted to prohibit courts from consulting their prior interpretive maxims in order to determine whether the language is ambiguous).

statute is often akin to chasing a mirage."). In truth, however, a dearth of relevant official legislative history[5] explaining what the General Assembly sought to accomplish in enacting the Business Combination Act or expanding upon the meaning of the terms used in the Act, forecloses any possibility of straying from the path of plain meaning even to the extent authorized by Section 1-2z for stubborn ambiguities.

### III.

The key provision of the Act for the purposes of this case is the definition of "business combination" in Section 33-840(4), quoted in its entirety below:

(4) "Business combination", when used with respect to any corporation, means: (A) Any merger, consolidation or share exchange of the corporation or any subsidiary with (i) any interested shareholder or (ii) any other domestic or foreign corporation, whether or not itself an interested shareholder, which is, or after the merger, consolidation or share exchange would be, an affiliate or associate of an interested shareholder that was an interested shareholder prior to the transaction; (B) any sale, lease, exchange, mortgage pledge, transfer or other disposition, other than in the usual and regular course of business, in one transaction or a series of transactions in any twelve-month period, to any interested shareholder or any affiliate or associate of any interested shareholder, other than the corporation or any of its subsidiaries, of any assets of the corporation or any subsidiary having, measured at the time the transaction or transactions are approved by the board of directors of the corporation, an aggregate book value as of the end of the corporation's most recent fiscal quarter of ten per cent or more of the total market value of the outstanding shares of the corporation or of its net worth as of the end of its most recent fiscal quarter; (C) the issuance or transfer by the corporation, or any subsidiary, in one transaction or a series of transactions, of any equity securities of the corporation or any subsidiary which have an aggregate market value of five per cent or more of the

---

[5] Kaman cites treatises discussing the problem of two-tier takeovers and a single contemporaneous law review article setting forth its author's views on how the Act came about and what it was intended to address. *See* Defendant Kaman Corporation's Pretrial Memorandum [doc. #24] at 10-12. Such post-enactment commentary is hardly a proper basis for determining what the General Assembly intended when it enacted the Act.  And even if the Court were inclined to look to legislative history, neither side has pointed to any proper legislative history that lends any assistance to the Court.  Therefore, the Court has not relied on any of the legislative history or academic commentary cited by the parties.

total market value of the outstanding shares of the corporation to any interested shareholder or any affiliate or associate of any interested shareholder, other than the corporation or any of its subsidiaries, except pursuant to the exercise of warrants, rights or options to subscribe to or purchase securities offered, issued or granted pro rata to all holders of the voting stock of the corporation or any other method affording substantially proportionate treatment to the holders of voting stock; (D) the adoption of any resolution for the liquidation or dissolution of the corporation or any subsidiary proposed by or on behalf of an interested shareholder or any affiliate or associate of any interested shareholder, other than the corporation or any of its subsidiaries; or (E) any reclassification of securities, including any reverse stock split, or recapitalization of the corporation, or any merger, consolidation or share exchange of the corporation with any of its subsidiaries which has the effect, directly or indirectly, in one transaction or a series of transactions, of increasing by five per cent or more of the total number of outstanding shares, the proportionate amount of the outstanding shares of any class of equity securities of the corporation or any subsidiary which is directly or indirectly owned by any interested shareholder or any affiliate or associate of any interested shareholder, other than the corporation or any of its subsidiaries.

Briefly put, Mason argues that Kaman's Recapitalization Proposal qualifies as a business combination (and therefore requires a supermajority vote of the shareholders) under Subsections A and E of Section 33-840(4). Mason's argument under Subsection A is straightforward. Mason claims that the Recapitalization Proposal is a "share exchange" within the meaning of Subsection A. Kaman disagrees. Mason's argument under Subsection E is more involved. Both parties agree that the Recapitalization Proposal is a "recapitalization" within the meaning of Subsection E. They also agree that because Subsection E contains a saving clause for transactions that do not increase the stock holdings of interested shareholders by more than 5% (the so-called "5% Rule"), not all transactions that fall within the ambit of Subsection E are "business combinations" within the meaning of Section 33-840(4). What the parties dispute is the scope of this saving clause. Kaman argues that the saving clause applies to all of the transactions listed in Subsection E – that is, "any reclassification of securities, including any reverse stock split, or recapitalization of the corporation,

16

or any merger, consolidation or share exchange of the corporation with any of its subsidiaries." Mason, by contrast, asserts that the saving clause applies only to its  last antecedent – namely, only to "any merger, consolidation or share exchange of the corporation with any of its subsidiaries" – and as a consequence, the saving clause does not insulate recapitalizations from the supermajority vote requirement.

Though the parties' stipulated questions of law start with Subsection A, the Court prefers instead to begin with Subsection E.  The reason is that the saving clause of Subsection E is Kaman's sole basis for asserting that the Recapitalization Proposal is not a business combination.  If Mason were to prevail on its interpretation of Subsection E, the Court would have no need to consider its additional arguments under Subsection A.

A.    Does the Recapitalization Fall Within the Saving clause of Section 33-840(4)(E)?

The parties agree that the Recapitalization Proposal is a "recapitalization" within the meaning of Subsection E.  What they dispute is whether the saving clause, and its 5% Rule, applies to recapitalizations, and, if it does, whether the Recapitalization Proposal as implemented satisfies the 5% Rule. The Court will address each argument in turn.

1.    *Does the 5% Rule Apply to Recapitalizations?*  Subsection E extends the definition of business combination to

> any reclassification of securities, including any reverse stock split, or recapitalization of the corporation, or any merger, consolidation or share exchange of the corporation with any of its subsidiaries *which has the effect, directly or indirectly, in one transaction or a series of transactions, of increasing by five per cent or more of the total number of outstanding shares, the proportionate amount of the outstanding shares of any class of equity securities of the corporation or any subsidiary which is directly or indirectly owned by any interested shareholder or any affiliate or associate of any interested shareholder, other than the corporation or any of its*

17

*subsidiaries.*

(emphasis added).  The Court has italicized the saving clause that is at issue.

Mason notes that there is no comma between the phrase "or any merger, consolidation or share exchange of the corporation with any of its subsidiaries" and the "which" clause that introduces the 5% Rule.  Invoking a rule of grammar known as the rule of last antecedent, Mason argues that the rules of grammar dictate that because there is no comma between the word "which" and the phrase that comes before it, the saving clause applies only to "mergers, consolidations and share exchanges with a subsidiary," and not to any of the other transactions listed in Subsection E – namely, reclassifications, recapitalizations, and reverse stock splits. Thus, as Mason reads Subsection E, it defines as a business combination the following transactions: (1) *any* reclassification of securities, including any reverse stock split, or recapitalization of the corporation; and (2) any merger, consolidation or share exchange of the corporation with any of its subsidiaries *which does not fall within the saving provision of the 5% Rule*. For several reasons, the Court concludes that the applying the last antecedent rule in the manner advanced by Mason is inconsistent with the text and structure of the Act.

The Connecticut legislature created five different subsections in Section 33-840(4) and chose to group together, in a single subsection, reclassifications, reverse stock splits, recapitalizations, and mergers, consolidations and share exchanges with a subsidiary.  Grouping these transactions together makes sense because, as both parties' experts testified, the practical economic consequences of these transactions ordinarily are the same: a reallocation of ownership stakes among existing claimants on the corporate financial structure. Put another way,  whatever a corporation can accomplish through a reclassification or recapitalization, it can also usually accomplish through a merger, consolidation,

18

or share exchange with a subsidiary. The same legislature that elected to place all of these transactions in a single subsection also chose to add a single saving clause at the end of that subsection, after all the transactions included in Subsection E had been listed.

For want of a comma between the saving clause and the clause immediately preceding it, Mason urges the Court to drive a wedge between transactions that all have the same practical economic outcome.  In effect, Mason wants the Court to read the statute as though the legislature had not written one Subsection E but instead had written two subsections – one dealing with reclassifications and recapitalizations, all of which are subject to the supermajority vote requirement, and another dealing with mergers, consolidations and share exchanges with subsidiaries, which are not subject to the supermajority vote requirement if they satisfy the 5% Rule.  Other than the ability of the legislature to place a comma where one is intended,[6] Mason advances no reason at all, let alone a cogent one, why all reclassifications, reverse stock splits, and recapitalizations should be subject to the supermajority rule no matter whether they increase the holdings of interested shareholders, while mergers, consolidations and share exchanges with a subsidiary – through which exactly the same economic outcome can be achieved – should be excepted from the supermajority

---

[6] The legislature has in fact passed a provision defining business combinations that includes the comma that is the source of dispute in this case. *See* Conn. Gen. Stat. § 33-843(4)(E). Section 33-843 was passed ten years after the provision at issue in this case, which the legislature explicitly grandfathered in enacting Section 33-843.  Unfortunately, the legislature's actions in 1994 do not assist the Court in determining the proper reading of Section 33-840(4)(E).  Although one might argue that Section 33-843 is evidence that the legislature (albeit not the same legislature) knows how to place a comma when it wants to, and thus must have consciously chosen not to do so in Section 33-840, one might equally argue that Section 33-840 should be read consistently with the more recent evidence of legislative intent reflected in Section 33-843(4)(E).

provisions if they satisfy the 5% Rule.[7]

Punctuation and grammar are important aids in reading the text of any statute.  But "[w]hile punctuation is a recognized aid to statutory construction" in Connecticut, "it is not conclusive." *State v. Roque*, 190 Conn. 143, 152 (1983). And although the Court is bound by the plain meaning of the statute, "a plain meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *Bank of Oregon v. Independent Insurance Agents*, 508 U.S. 439, 454 (1993).  Therefore, even its most ardent admirers recognize that "the grammatical rule of the last antecedent . . . is not an absolute." *Barnhart  v. Thomas*, 540 U.S. 20, 26 (2003) (Scalia, J.); *accord State v. Clein*, No. CR 1023043, 1996 WL 686905, at *2 (Conn. Sup. Ct. Nov. 19, 1996) (last antecedent rule applies so long as "no contrary intention appears."); 2A N. Singer, *Sutherland Statutes and Statutory Construction* § 47.33, at 371-72 (6th ed. 2000) (The last antecedent rule "is not inflexible and uniformly binding. Where the sense of the entire act requires that a qualifying word or phrase apply to several preceding or even succeeding sections, the word or phrase will not be restricted to its immediate antecedent."). The Court declines to use a missing comma to require a supermajority vote on all reclassifications and recapitalizations while allowing functionally identical transactions enumerated in the same sentence of the same subsection of the Act to take advantage of the 5% Rule.  Neither the structure nor the text of Subsection E requires such a result. Therefore, the Court construes the plain meaning of Subsection E to apply the 5% Rule, and therefore the exemption from the Business Combination Act, to all of the transactions listed in

---

[7] The Court also notes with some irony that although Mason staunchly opposes reading a single comma into the statute, Mason's expert, Professor Alan Schwartz, urged the Court to read into Subsection E an entire phrase – the words "with an interested shareholder" – to ensure that Subsection E, as construed by Mason, did not end up requiring a supermajority vote to approve all reclassifications, including those that did not involve interested shareholders.

Subsection E, including recapitalizations.

2.    *Does the Recapitalization Proposal Satisfy the 5% Rule?*   Based on the Court's reading of the statute, Section 33-840(4)(E) excepts from the supermajority requirement any recapitalization that does not increase "by five per cent or more of the total number of outstanding shares, the proportionate amount of the outstanding shares of any class of equity securities of the corporation . . . owned by any interested shareholder." Mason argues that the Recapitalization Proposal does in fact increase the proportionate amount of the Kaman family's ownership of shares by more than 5%, and therefore the Recapitalization Proposal is ineligible for the supermajority-vote exception created by the 5% Rule.  Mason arrives at this conclusion by making a before-and-after comparison of the Kaman family's holdings of the voting Common Stock that will result from consummation of the Recapitalization Proposal.   As indicated previously, before the Recapitalization Proposal is effectuated, the Kaman family owns a large majority of the Class B voting stock and a small amount of Class A non-voting stock.  Therefore, regarding the voting Common Stock that will result from the Recapitalization Proposal, Mason claims that the Kaman family has a baseline ownership of zero. After the Recapitalization Proposal is effectuated, the Kaman family will control 7.66% of the voting Common Stock. Because 7.66% is greater than 5%, Mason asserts that the Recapitalization Proposal does not fit within the saving clause of Section 33-840(4)(E).

The Court is not convinced by Mason's suggested application of the 5% Rule.  The language of the provision, in particular its use of the term "proportionate increase," and the clear purpose to prevent interested shareholders from arranging large windfalls for themselves, appears to the Court to require consideration of the interested shareholders' stake in the corporation before and after the transaction. Mason's methodology simply wishes away the Kaman family's *ex ante* holdings. This

cannot be correct.

Although it is clear to the Court that Mason's approach is incorrect, the right methodology for calculating compliance with the 5% Rule is more elusive. Kaman briefed three different possibilities, all of which strike the Court as reasonable. *See* Defendant Kaman Corporation's Post-Trial Memorandum [doc. #81] at 4-8.[8] First, Kaman suggested that the 5% Rule requires comparison of the interested shareholders' proportionate share of the pre-transaction non-voting Class A stock and the post-transaction voting Common Stock. Kaman's rationale here is that Class A stock is the only class of equity securities that survives the recapitalization, the certificate of incorporation being amended to endow Class A stock with voting rights and redesignate it as Common Stock. In the alternative, Kaman suggested that the 5% Rule could be construed to require a comparison of the interested shareholders' pre-transaction and post-transaction proportionate share of voting power, or of total equity capitalization. Under the former approach, the Kaman family's pre-transaction proportionate share of Class B voting stock would be compared with their post-transaction holdings of voting Common Stock. The latter approach would compare the Kaman family's holdings of Class A and Class B shares before the transaction to their proportionate share of Common Stock after the transaction. Fortunately, the Court finds it unnecessary to preempt consideration by Connecticut courts of which of these methodologies is most consistent with the statutory text, structure, and purpose, because Kaman represented, and Mason did not dispute, that the Recapitalization Proposal

---

[8] Kaman also submitted a post-trial affidavit by its Chief Legal Officer. Mason moved to strike portions of this affidavit offered by Kaman to rebut Mason's assertion that Common Stock is an entirely new class of stock and to support Kaman's contention that a stay pending appeal would substantially harm Kaman. Since the Court does not rely on any part of the contested affidavit, Mason's Motion to Strike Portions of the Affidavit of Candace A. Clark [doc. #84] is DENIED AS MOOT.

satisfies the 5% Rule under any of Kaman's suggested approaches, all of which are more consistent with the text of the Act than Mason's.

In sum, the Court concludes that the Recapitalization Proposal qualifies for the saving clause of Subsection 33-840(4)(E) because the saving clause applies to all transactions enumerated in Subsection 33-840(4)(E), including recapitalizations, and because the transaction implemented by the Recapitalization Proposal will not lead to a proportionate increase greater than 5% in the stock holdings of the Kaman family, as required by the 5% Rule.

2.      Is the Recapitalization a Share Exchange Within the Ambit of Section 33-840(4)(A)?

Mason argues that even if the Recapitalization Proposal fits within the saving clause created by Subsection 33-840(4)(E), the transaction is nonetheless a business combination subject to the supermajority vote requirement of the Act because it qualifies as a "share exchange" within the meaning of Subsection 33-840(4)(A).   Subsection A, in relevant part, defines as a business combination "[a]ny merger, consolidation or *share exchange* of the corporation or any subsidiary with (i) any interested shareholder."   Conn. Gen. Stat. § 33-840(4)(A) (emphasis added). The Business Combination Act further defines the term "share exchange" as "an exchange offer or any other exchange of securities of a person for the voting stock of a corporation." Conn. Gen. Stat. § 33-840(12).

In its pre-trial briefs [docs. ##25 & 47] and at oral argument, Mason did not seriously suggest that the Recapitalization Proposal was "an exchange offer."[9] Rather, Mason focused on the second

---

[9] In its Post-Trial Memorandum Regarding the Proper Application of the 5% Test [doc. #78], Mason for the first time suggested that the Recapitalization Proposal is "an exchange offer." *See id.* at 6-7. However, Mason's argument consisted of no analysis or explanation for its change of mind.

clause of the definition of share exchange  –  "any other exchange of securities of a person for the voting stock of a corporation." *See, e.g.*, Pl.'s Trial Br. [doc. #25] at 14; Pl.'s Opp. Br. [doc. #47] at 8, 14. Mason asserts that the Court is bound by Connecticut's Plain Meaning Act to apply the definition literally, and that so construed the definition is a catch-all that necessarily encompasses the Recapitalization Proposal because that transaction literally involves at least some shareholders exchanging their Class B shares for cash and shares of voting Common Stock.[10] The Court is unpersuaded.   The Court understands and agrees that under the Plain Meaning Act, the Court must hew closely to the words of the statute.  But, as a noted advocate of the plain meaning approach has explained, "the good textualist is not a literalist[;] neither is he a nihilist." Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 24 (1997). "The particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense were they intended to be understood or what understanding they convey when used in the particular act." 2A N. Singer, *Sutherland Statutes and Statutory Construction* § 46:07 at 204. (6th ed. 2000).

---

Instead, Mason's argument appears to be based upon a rather strained inference of implicit concession by Kaman based on the form of Kaman's filings with the SEC. The Court declines to consider Mason's post-trial change of argument.

[10] In support of this literal interpretation, Mason cites Kaman's frequent use in its Proxy Statement of the term "exchange" to describe the transaction, and similar use by the SEC and courts to describe transactions in which shareholders give up one type of stock in return for another. *See* Pl.'s Trial Br. at 15-17; Pl.'s Opp. Br. at 9-11. Kaman objects that the Recapitalization Proposal does not involve even a literal exchange of shares, because the company will not obtain its shareholders' Class A and Class B stock certificates and then give them shares of voting Common Stock in return. Instead, Kaman will simply amend the company's certificate of incorporation to redesignate Class A and reclassify Class B stock as voting Common Stock. However, Kaman's argument does not rebut Mason's assertion that the transaction literally involves an exchange – at least insofar as the Class B shareholders who opt for the part stock/part cash option are concerned – and even Kaman concedes that it described the transaction as an exchange to its shareholders.   Therefore, the Court accepts Mason's claim that the transaction literally involves an exchange of securities.

The phrase "any other exchange of securities of a person for the voting stock of a corporation," certainly has all the textual attributes of a catch-all provision.  It is introduced by the words "or any other," and it uses the broad general terms "exchange" and "person," where "person" is defined to include "a natural person, company, partnership, foreign or domestic corporation, limited liability company," Section 33-840(11).  However,  determining what "all" the statutory phrase "catches" requires a contextual analysis of the language of Subsection A and its relationship to the rest of Section 33-840(4). *See, e.g.*, *Cloukey v. Leuba*, 47 Conn. Supp. 263, 270 (Connecticut Superior Court 2000) (" 'The court must interpret the statute as written . . . and it is to be considered as a whole, with a view toward reconciling its separate parts.' ") (quoting *Ganim v. Roberts*, 204 Conn. 760, 763 (1987)); *accord Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003) ("The text's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute"); *Auburn Housing Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002) ("The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another. In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute."). Construing the catch-all in its context, the Court concludes that whatever the superficial plausibility of Mason's broad and literal interpretation, a somewhat narrower reading is required by the text and structure of the statute.[11]

In determining the appropriate scope of the catch-all phrase "any other exchange of securities

---

[11] In an attempt to narrow the reach of the catch-all component of the statutory definition of share exchange, Kaman suggested that the term "of a person" be construed as "issued by a person" and the phrase "the voting stock" be construed to mean "the entire voting stock." The Court declines to adopt these strained theories or read additional words into the statute.

of a person for the voting stock of a corporation" in Subsection A, the Court begins with its immediate context – that is, the terms preceding it in Subsection A, "merger" and "consolidation." On their face, these terms are rather broad and capacious. In particular, given their literal meaning, they would clearly encompass mergers and consolidations between a corporation and a subsidiary. But even Mason concedes that, at a minimum, Subsection E is intended to exempt mergers and consolidations of a corporation with a subsidiary so long as the transaction complies with the 5% Rule. It is therefore clearly at odds with the statutory text and the structure of Section 33-840(4) to give the terms "merger" and "consolidation" in Subsection A their literal, and capacious, meaning. Instead, these terms must be read so as to exclude the transactions in Subsection E, which the General Assembly chose to except from the supermajority vote requirement of the Business Combination Act. Otherwise, in accordance with Mason's interpretation, Subsection A would swallow Subsection E, rendering its exception meaningless, in defiance of the principle that courts should construe statutes to give meaning to each provision.[12] *See, e.g.*, *Semerzakis v. Commissioner of Social Services*, 274 Conn. 1, 18 (2005) ("[I]t is understood that the legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant"); *Connelly v. Commissioner of Correction*, 258 Conn. 394, 410 (2001).

---

[12] Indeed, at trial, the Court asked Mason to provide an example of a transaction that would be a reclassification subject to the Business Combination Act by  Subsection E, but would not qualify as a share exchange within the meaning of Subsection A as construed by Mason. Mason proposed a reclassification of only non-voting stock, where interested shareholders owned only voting stock. But as Kaman pointed out in its post-trial memorandum, Mason's example is not responsive to the Court's question because, while the transaction it proposes would not come within Subsection A, it also would not be caught by Subsection E because it would not affect the holdings of any interested shareholder.

What then does this mean for the interpretation of the catch-all phrase "any other exchange of securities of a person for the voting stock of a corporation"? Two familiar canons of construction, *noscitur a sociis* and *ejusdem generis*, provide guidance to courts in interpreting broad and general terms in their context. *Noscitur a sociis* suggests that a term should be construed in light of its textual neighbors, while *ejusdem generis* suggests that a general term that follows more specific terms should be read to embrace only objects similar in nature to those enumerated by the preceding specific words. Like federal courts, Connecticut courts seek guidance from these canons in construing statutes. *See, e.g.*, *Connecticut National Bank v. Giacomi*, 242 Conn. 17, 33 (1997) ("If two or more words are grouped together, it is possible to ascertain the meaning of a particular word by reference to its relationship with other associated words and phrases under the doctrine of noscitur a sociis.") (internal quotation marks omitted); *State v. Russell,* 218 Conn. 273, 278 (1991) ("According to the rule of ejusdem generis, unless a contrary intent appears, where general terms are followed by specific terms in a statute, the general terms will be construed to embrace things of the same general kind or character as those specifically enumerated."). These canons suggest that, like the terms that precede it, the catch-all phrase "any other exchange of securities of a person for the voting stock of a corporation" should not be given the broadest possible interpretation consistent with the literal use of its words, but should be interpreted, like its textual neighbors, so as not to overlap with the transactions specifically enumerated in, and subject to the saving clause of, Subsection E.

Of course, *ejusdem generis* and *noscitur a sociis* are merely interpretive signposts and "not an inviolate rule of law;" they provide a "guideline to legislative meaning, but . . . cannot displace the result of careful and thoughtful interpretation." *Commission on Human Rights and Opportunities*

27

*v. Board of Educ. of Town of Cheshire*, 270 Conn. 665, 703 n.34 (2004). In this case, the Court finds

the limitation on Subsection A suggested by these axioms persuasive because it makes good sense

of both the text and the structure of Section 33-840(4).

Structurally, Section 33-840(4) consists of five subsections separated by the disjunctive "or."

Each subsection groups together several similar kinds of transaction, including: mergers,

consolidations and share exchanges in A; sales, leases and mortgage pledges in B; issuance and

transfer of securities in C; liquidation and dissolution proposals in D; reclassifications and mergers

with subsidiaries in E. Further, Subsections B, C, and E enumerate specific conditions under which

the group of transactions specified in those subsections should be regarded as business combinations.

Thus, under Subsection B, sales of assets to an interested shareholder are only subjected to the

supermajority voting requirements of the Act when they are not done in the usual course of business

and when they involve assets valued at ten percent or more of the corporation's net worth. Similarly,

under Subsection C, transfer to an interested shareholder of securities having a value equal to five

percent or more of the total outstanding shares is only subject to the supermajority vote requirement

if other holders of voting stock did not have a similar opportunity. Finally, Subsection E appears to

regulate only those reclassifications that lead to a proportionate increase of five percent or more in

the holdings of an interested shareholder.

These attributes of the statute indicate to the Court that each subsection regulates a distinct

set of transactions regarded by the legislature as posing a threat that would justify requiring a

supermajority vote under distinct sets of circumstances. Mason's interpretation of Subsection A is

inconsistent with the Act's structure because it creates substantial overlap between Subsections A

and E (and perhaps other subsections as well). For Mason's construction takes out of Subsection E

with its saving clause transactions that clearly fall within the legislative specification of the category "reclassifications, including reverse stock splits and recapitalizations," thereby subjecting those transactions to the more stringent requirements of Subsection A regardless whether they satisfy the 5% Rule. Therefore, the Court concludes that the catch-all phrase "other exchange of securities of a person for the voting stock of a corporation" should be construed to capture those transactions that are the functional equivalents of those mergers, consolidations and exchange offers that are subject to Subsection A. The Recapitalization Proposal is not such a transaction.

Although the Court construes the catch-all component of the definition of share exchange more narrowly than Mason, the Court's interpretation nonetheless gives meaning to the catch-all phrase "any other exchange of securities of a person for the voting stock of a corporation." On the Court's view of the scope of Subsection A, the statute will still require a supermajority vote for transactions that may not meet the usual definition, or carry the label, of an exchange offer, merger, or consolidation, but nonetheless have similar attributes.  Kaman provided two examples of such transactions in its Post-Trial Memorandum:

1.  Assume a corporate raider establishes an Acquisition Company and purchases more than 10% of Target Company. Subsequently, Acquisition Company – already an interested shareholder – offers its own equity shares to acquire additional voting stock of the Target Company in a private transaction. This transaction is not a merger or consolidation and it is not a technical exchange offer because it is a private transaction unregulated by the Williams Act and without any incidents of a tender offer.

Similarly, assume a raider establishes an Acquisition Company and purchases more than 10% of Target Company. The three largest shareholders of the Target Company are thereafter privately approached and offered shares of the Acquisition Company for additional securities of the Target Company. Here again, this transaction is not an "exchange offer" even though it accomplishes the same result as an exchange offer via some "other exchange of securities of a person for the voting stock of a corporation."

Defendant Kaman's Post-Trial Memorandum [doc. #81] at 13.

In this way, the Court's interpretation gives meaning to each aspect of the definition of share exchange and to all the textual and structural attributes of the statute. Moreover, unlike Mason's suggested construction, the Court's interpretation does not run the risk of paralyzing businesses by subjecting to a supermajority vote a large variety of ordinary intra-corporate business transactions, including the issuance of new stock certificates to interested shareholders in order to remove restrictive legends, or replace lost or damaged certificates, or to break up large blocks of shares with smaller denomination certificates, all of which literally involve an "exchange" of stock with an interested shareholder but do not appear to implicate the concerns addressed in the text of the Business Combination Act.

Even if Mason's expansive interpretation of the term "share exchange" were correct, its argument that the Recapitalization Proposal is therefore subject to the supermajority vote requirement of the Business Combination Act would run afoul of the general interpretive principle that the specific ordinarily controls the general.  Here's why.  If Mason's reading of the statute were correct, then the Recapitalization Proposal would fall both within Subsection E, as a recapitalization, and Subsection A, as a share exchange.  Subsections 33-840(4)(A) and (E) thus would cover the same subject matter (share exchanges, some of which are also recapitalizations) at different levels of generality. But Connecticut courts, like federal courts, are guided in their interpretation of statutes by the principle that "[w]here there are two provisions in a statute, one of which is general and designed to apply to cases generally, and the other is particular and relates to only one case or subject within the scope of a general provision, then the particular provision must prevail." *Budkofsky v. Commissioner of Motor Vehicles*, 177 Conn. 588, 592 (1979); *see also Miller v. Egan*, 265 Conn.

301, 332 (2003) ("[S]pecific terms covering the given subject matter will prevail over general language of the same or another statute which might otherwise prove controlling.").

The decision of the Connecticut Supreme Court in *Budkofsky* is a particularly relevant to the facts of the current dispute.  Like Section 33-840(4), the statute at issue in *Budkofsky* featured the same broad category of objects in two different sections, and the second section qualified the category and restricted the application of the statute with respect to the narrowed category. The first provision stated that "No motor vehicle shall be operated or towed upon any highway, except as otherwise expressly provided, without first being registered with the commissioner." *Budkofsky*, 177 Conn. at 590. The second provision provided that "Any *commercial* motor vehicle . . . shall be registered in this state if: (1) it is most frequently garaged in this state, or, . . . most frequently leaves from and returns to . . . this state . . . ." *Id.* (emphasis added). A Connecticut resident owned a Mack truck, which he registered in Florida because he frequently traveled and stayed there. *Id.* at 589. The commissioner argued that a Mack truck is literally a " motor vehicle," and since it was owned by a Connecticut resident, the truck had to be registered in Connecticut. *Id.* The Connecticut Supreme Court rejected the commissioner's argument on the grounds that the more specific provision regulating "commercial motor vehicles" controlled the more general provision regulating "motor vehicles."

The reasoning of the Connecticut Supreme Court in *Budkofsky* applies equally to Mason's argument: Whether or not the Recapitalization Proposal is a share exchange, it is certainly a recapitalization.  Therefore, as in *Budkofsky*,  the more specific Subsection E, along with  its saving clause, controls and exempts the Recapitalization Proposal from the supermajority vote requirement of the Business Combination Act.

*Budkofsky* was, of course, decided before the Connecticut legislature passed the Plain Meaning Act. To date, however, the Connecticut Supreme Court has not indicated that it sees any tension between adherence to the mandate of that Act and continued application in appropriate instances of the axiom that the specific controls the general, and the Connecticut Supreme Court continues to apply it.  *See, e.g.*, *Semerzakis*, 274 Conn. at 18 ("It is well settled that where statutes contain specific and general references covering the same subject matter, the specific references prevail over the general.") (internal quotation marks omitted); *Town of Cheshire,* 270 Conn. at 687 n.20, 723 (recognizing in one part of the opinion the intent of the legislature to require adherence to the plain meaning rule, but concluding that textual ambiguity rendered the rule inapposite, and considering in a later part of the opinion the argument that specific provisions  trump more general ones, but concluding that the provisions were of comparable specificity).

To summarize, the Court concludes that it is most consistent with the text, structure and evident purpose of the statute to interpret Section 33-840(4)(A) so as not to apply to the Recapitalization Proposal, to construe Section 33-840(4)(E) as the governing provision in this case, and to read Subsection E's saving clause as applying to the Recapitalization Proposal. As a consequence, the Recapitalization Proposal is not a "business combination" within the meaning of Section 33-840(4), and Kaman does not need to comply with the supermajority voting requirement of Section 33-841. The Court answers the parties's stipulated questions of law as follows:

1.      Has Mason met its burden of proof that the Recapitalization Proposal is a business combination involving a merger, consolidation or share exchange with an interested shareholder within the meaning of the Business

Combination Act, Conn. Gen. Stat. § 33-840(4)(A)?  **No**.

2.      Has Mason met its burden of proof that the Recapitalization Proposal is a

business combination involving a reclassification of securities, including any

reverse stock split, or recapitalization of the corporation, within the meaning

of the Business Combination Act, Conn. Gen. Stat. § 33-840(4)(E)?  **No**.

Because the Court finds for Kaman on the first two questions, it does not reach the third and fourth

questions respecting Mason's burden as to permanent injunctive relief and Kaman's burden as to its

special defenses.[13]

For the foregoing reasons, Mason's request for declaratory relief and for relief enjoining the

implementation of the Recapitalization Proposal is DENIED.

## IV.

Anticipating the possibility that its request for relief would be denied, Mason has filed a

Motion for Entry of Partial Final Judgment [doc. #80] and a Motion for Injunction Pending Appeal

[doc. #82]. The Court addresses each of these motions in turn.

With respect to Mason's Motion for Entry of Partial Final Judgment [doc. #80], *Federal Rule*

*of Civil Procedure* 54(b) provides as follows:

> When more than one claim for relief is presented in an action, whether as a claim,
> counterclaim, cross-claim, or third-party claim, the court may direct the entry of a
> final judgment as to one or more but fewer than all of the claims or parties only upon
> an express determination that there is no just reason for delay and upon an express

---

[13] The Court also notes that, in its post-trial brief, Kaman decided not to pursue the argument that, should the Court find in Mason's favor, it should nevertheless refrain from issuing a permanent injunction because Mason would not be irreparably harmed by the consummation of the Recapitalization. However, Kaman reserved the right to press its argument on irreparable harm should the Court's ruling lead Mason to request a stay pending appeal. *See* Defendant Kaman Corporation's Post-Trial Memorandum [doc. #81] at 14.

direction for the entry of judgment.

Accordingly, the Second Circuit has stated that final judgment under Rule 54(b) requires satisfaction of the following three conditions:

> (1) multiple *claims* or multiple *parties* must be present, (2) at least one claim, or the rights and liabilities of at least one party, must be finally decided within the meaning of 28 U.S.C. § 1291, and (3) the district court must make "an express determination that there is no just reason for delay" and expressly direct the clerk to enter judgment.

*Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1091 (2d Cir. 1992) (italics in original).

In the case before the Court, Kaman has filed a counterclaim for abuse of process, which the Court has not yet heard. However, as this Court's decision to try the claims separately indicates, Mason's request for declaratory and injunctive relief is neither "inherently inseparable" from nor "inextricably interrelated" to Kaman's counterclaim, *Ginett*, 962 F.2d at 1096. Furthermore, because the Court's ruling "ends the litigation [of Mason's claim] on the merits and leaves nothing for the Court to do but execute the judgment," it is a final decision within the meaning of Rule 54(b). *Id.* at 1092. Finally, the Court is satisfied that both parties have an interest in a speedy appeal to resolve the legality of Kaman's proposed transaction and to put an end to the current uncertainty and delay. While the Court notes that Mason's application for entry of partial final judgment is puzzling in view of the availability of review from a denial of an injunction under 28 U.S.C. § 1292(a)(1), Kaman has not objected to the entry of partial judgment. Therefore, in accordance with Rule 54(b) and in an abundance of caution, the Court "determines that there is no just reason for delay." Accordingly, the Court GRANTS Mason's Motion for Entry of Partial Final Judgment [doc. #80].

Turning to Mason's request for an injunction pending appeal, the Court must evaluate the following four factors: "the likelihood of success on the merits, irreparable injury if a stay [or injunction] is denied, substantial injury to the party opposing a stay [or injunction] if one is issued,

and the public interest." *Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *see also U.S. v. One Parcel of Property Located at 32 Medley Lane*, 372 F. Supp. 2d 248, 272 (D. Conn. 2005). Although the Court believes that its reading of the Business Combination Act is more consistent with the text and structure of the statute than that proposed by Mason, the drafting of the statute is less than exemplary, and neither the Connecticut courts nor the Second Circuit have yet had occasion to interpret the provisions here at issue. A correct interpretation of a statute regulating a broad array of corporate transactions is clearly a pressing matter of public interest. The Court also finds that Mason will be irreparably harmed if the Recapitalization Proposal is implemented, because the restructuring of Kaman's equity and the elimination of the rights that Mason currently enjoys as a Class B shareholder will be irreversible (a fact to which Kaman has stipulated, *see* Joint Stipulation of Facts [doc. #27] ¶ 45) and not compensable by monetary damages. *See Sperry Int'l Trade, Inc. v. Gov't of Israel*, 670 F.2d 8, 12 (2d Cir. 1982) (defining irreparable harm as "the kind of injury for which an award of money cannot compensate"); *Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d 687, 698 (2d Cir. 1973) ("[I]f this court permitted the tender offer to be consummated and at some later date were to find the violations charged . . . it would be almost impossible to unravel the situation.").

However, the Court also takes seriously the harm of further perpetuating uncertainty as to the future control of Kaman, and delaying effectuation of a transaction approved by a large majority of the Class A shareholders and found to be within the letter of the law by this Court. Weighing these factors, the Court concludes that the balance of the harms counsels against granting an injunction for as long as it takes to complete the ordinary process of appellate review. Nonetheless, the Court believes that it is appropriate to issue a more limited injunction to provide Mason with time to ask

the Second Circuit to hear its appeal on an expedited basis and to grant a more extended injunction if the Second Circuit sees fit so to do.  Therefore, the Court GRANTS IN PART Mason's Motion for Injunction Pending Appeal [doc. #82] and will enjoin Kaman from consummating the Recapitalization Proposal until December 1, 2005.[14] Because the injunction will remain in effect for such a brief period, the Court will not require a security bond, but if the Second Circuit chooses to extend the period of the injunction pending appeal, it may wish to reconsider the desirability of requiring security.

## V.

Accordingly, the Court enters the following orders:

1.    Plaintiff Mason's request for declaratory and injunctive relief is DENIED.

2.    Finding that there is no just reason for delay, the Court GRANTS Mason's Motion for Entry of Judgment under Rule 54(b) [doc. #80] and **directs the Clerk to enter final judgment for all Defendants on all counts of the Complaint [doc. #1].**

3.    The Court GRANTS IN PART Plaintiff Mason's Motion for Injunction Pending Appeal [doc. #82].  Kaman is enjoined from taking any steps to effectuate or consummate the Recapitalization Proposal **until December 1, 2005** in order to provide Mason with time to seek further relief in the Second Circuit.  A separate order setting forth the terms of injunction shall issue this same date.

4.    The parties shall submit a proposed schedule for disposition of Defendant Kaman

---

[14] The Court notes that the Recapitalization Proposal anticipated that consummation of the transaction might take up to six months from the signing of the agreement with the Signatory Shareholders, and accordingly provided that that agreement  would not expire until December 7, 2005. *See* Plaintiff's Exhibit 1, at ¶ 12(b)(v).

Corporation's counterclaims **by November 18, 2005** .

5.      Defendant Kaman's Motion to Dismiss [doc. #71] is DENIED AS MOOT.

6.      Plaintiff Mason's Motion in Limine to Preclude Expert Testimony [doc. #43] is

GRANTED IN PART and DENIED IN PART.

7.      Plaintiff Mason's Motion to Strike Portions of the Affidavit of Candace A. Clark

[doc. #84] is DENIED as MOOT.


IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: <u>October 31, 2005.</u>**